May it please the Court, Wendy Ray on behalf of Appellant Elseville Parks. The District Court's decision to grant summary judgment in this matter was erroneous for three reasons. First, the District Court did not address the issue of sincerity. Appellant submitted evidence attesting to his sincere religious beliefs, which raised a genuine dispute of material fact. Moreover, the prison's regulation, which limits religious diets only to those inmates who can provide hereditary, social, or substantial philosophical connections, is unconstitutional in its face because it does not test for sincerity. Secondly, Counsel, I, Counsel Judge Gould, I've got a question for you. In the context of a prison conversion, can sincerity be made out, you know, just by someone's say-so, or do they have to have some level of objective proof that supports that they've, in fact, converted? Well, here the inmate was a pro se litigant. He did submit evidence attesting to his sincere beliefs, and I think a number of prisons look to any violation or inconsistency with that belief as a basis for denying kosher meals. Moreover, here Appellant did produce some limited objective evidence as to his sincerity. For example, he persisted in requesting religious materials and religious assistance from a number of outside organizations, two of which acknowledged in their correspondence with him that he had demonstrated to them that he was sincere in his beliefs. So I think in this instance leniency is warranted in this regard because of the pro se nature of this case as well. So leniency in the sense of treating this as a disputed question of fact, not suitable for resolution at summary judgment? Correct. And it's the posture of summary judgment and the burden that is on the government to produce evidence of lack of dispute here. What's a practical solution to the problem, though? That is, we're quite familiar with the general problem, and I'm now not speaking specifically about your client. Prisoners, I mean, they've got nowhere to go. They don't have a lot to do. Maybe the kosher meals are better. Maybe the prison could solve this by making the kosher meals as unappetizing as the other meals. I don't suggest that, but that's a possibility. And, you know, I might want a little action. So this week I'm going to say I'm Jewish and I want kosher meals. What realistically can the prison do in order to be both fair and comply with the Constitution, yet keep off to one side what might be frivolous or I'm bored and I want better food requests based upon a change of religious belief? Well, one approach that some prisons have taken is to grant the religious meal upon request, but then to monitor the consistency of the adherence to both the dietary restrictions as well as other evidence of practice of religion. A number of states, including Arkansas, Montana and New Jersey, take this approach. In addition, here, this particular prison had a regulation in which it permitted prisoners to assert their religious preference. And so long as there was no violation, it would accommodate that meal. And it restricted changes in religious preferences to once every 12 months. And there's no evidence in this record that there was a substantial burden on the prison under this previous regulation. And there were no findings of fact by the district court in this regard. So the previous plan was like enrolling in a health plan? There's only one window at once every 12 months where you can change religions? That's correct. I mean, I think it addresses some of the court's concerns about, you know, frivolous changes of religious preferences. Counsel, what relevance, if any, is there in the idea that a person could convert to Judaism but not be Orthodox? And, you know, except for Orthodox Jews, you know, other Jews don't need to have kosher meals under the tenets of the religion as the conservative, or Reform aspects of Judaism would see it. So does that have any pertinence to his request here? I don't believe it does, because I think that the court was in error in asserting a particular ecclesiastical or Orthodox view with respect to the religion. I mean, the key issue is whether a person is sincere in his or her personal beliefs. And here the appellant demonstrated evidence of his sincerity that, in his view, he was Jewish and needed kosher meals in order to practice his religion. And, for example, in U.S. v. Ward, the court ruled that sincerity may only be judged on devotional grounds and not in definitional grounds. And here the prison was asserting a purely definitional ground that an Orthodox Jew is the only type of Jew who is entirely Jewish. And here the court was asserting a purely definitional ground that an Orthodox Jew is the only type of Jew who is entirely Jewish. May I ask a procedural question, the pertinence of which may not be readily apparent? This case began in the Nevada State Court, did it not? That's correct. And the claim was of violations of the Federal Constitution. Correct. Is there a reason for going to the State Court rather than directly into the Federal Court? Well, here, again, the inmate was proceeding pro se, and I don't think that he was aware of the procedure. This was his initial choice. And I guess I will have to find out from your adversary as to why it became appropriate to remove. I'm not aware of what happened procedurally there. I won't hold you accountable for that, but I find it intriguing. I would have thought the Nevada Court could probably have dealt perfectly well with these issues. Of course. I wanted to quickly address the issue of RLUIPA. Here in the initial complaints, appellant alleged Federal statutory violations, and then in opposition to the summary judgment, he raised the issue of claims under the RLUIPA. And under the recent Alvarez v. Hill decision, even if RLUIPA is not specifically pled in the complaint, Rule 8 is satisfied if there are factual allegations that support a plausible claim, and or if the responsive pleading clarifies that RLUIPA is issue. Here, both there were sufficient pleadings to give notice to the defendants that RLUIPA might be at issue, and the statutory claims were specifically at issue. And then in the opposition to the summary judgment, RLUIPA was specifically asserted, and so therefore it was error for the district court not to consider the claims under the strict scrutiny standard of RLUIPA. And then lastly, even if Turner were applied, the court failed to make adequate findings of fact as required under the Turner analysis. And so I think I'm going to leave it at this. For a second, counsel, can I take you back to RLUIPA? Of course. Assuming RLUIPA would apply, doesn't it require some significant intrusion on religious liberty? It requires a substantial burden on the religious practice. And here. OK, well, then I guess my question is, if someone is not like Orthodox Jewish, but just is Jewish, is it a burden on their religious practice to say no kosher food? I think this goes back to your earlier question, which was here there wasn't an adequate determination of sincerity. So there was no finding with respect to what this prisoner's specific religious beliefs were. And it wasn't appropriate for the court to determine that only a strict Orthodox Jew would require a kosher meal. So the evidence that he submitted is that his sincere religious belief is that as he practices Judaism himself, he requires a kosher meal in order to practice his religion. Let's say he said, for example, that he was Catholic, but in his personal brand of Catholic religion, that he needed kosher food. What's the result? Do you need a sincerity hearing? I think there does need to be an initial determination with regard to sincerity. For example, in the Malik versus Brown case, the court acknowledged that, I'm sorry, in the U.S. v. Horde case, the court acknowledged that others may not understand a person's particular interpretation of a religion, and it may even seem ridiculous to other people. The real question is not whether the religion meets some sort of definitional grounds, which I would argue is not appropriate for the court or for the government to decide, but rather whether a person is sincerely asserting a religious belief personal to him that he believes he needs a kosher meal to practice. And so it may seem absurd, but I think that this court has held that even if it's absurd, if it's sincere, it needs to be accommodated. You really mean that as a full response to Judge Gould's question? If we have a scenario in which Judge Gould's hypothetical Catholic inmate is saying, I need a kosher meal, and it turns out, and indeed the inmate acknowledges, that she is the first Catholic to profess kosher food as a religious requirement, would we still be having a hearing to determine whether that was a sincere religious belief? I mean, I think it's possible. It may be a very brief inquiry that proves that someone who is strictly adhering to all the rest of the tenets of Catholicism does not really have a sincere belief that she needs a kosher meal. But I think that both here, given the posture of summary judgment, there is a dispute of fact about whether Mr. Park sincerely believed that he needed a kosher meal. So on that procedural posture, I think it's important to recognize that. But in addition, I think that we need to recognize that you can't apply a strict orthodoxy standard. A number of religious adherents don't adhere to every religious tenet, and courts have acknowledged that that doesn't preclude them from having the way that they're practicing their religion accommodate in some way in appropriate instances. Now, if we agree with your position and reverse the summary judgment, is the next stop a jury trial? It may be. My understanding is that there was very limited discovery in this matter, and it may well be that that's the case. In other words, what I have to say, I'm not going to be a fact finder in this case, but as I just look at this, is I have to say on a fairly slender showing that this man is a sincere practitioner of orthodox Judaism. Now, I concede there's some dispute, and I concede that the book that was found in the cell was not purely a Muslim book. I mean, I don't know. I've got in mind what the evidence is, but it strikes me as a pretty slender showing. We've got to have a jury trial on this? That's where we're headed? Well, there's no evidence that Mr. Parks did not adhere to, you know, his religious beliefs, I mean, other than the finding of a book in his cell, which was based on a search that was instigated because he made a complaint prior to his conversion about interference with a practice by an inmate. I understand that there's very slim evidence on this record, but again, you know, Mr. Parks was proceeding pro se and did not have access to, you know, fully develop the record here, but there is no evidence that he didn't adhere strictly to these beliefs. And indeed, he asserts that, you know, he's lost weight. Well, what about the chaplain interview? He was interviewed by the chaplain, I think. Right. Who gave a view that he wasn't, you know, sincerely in this religion, I think. I would actually disagree with that. Or that he wasn't entitled to a kosher meal, maybe. That's correct. What's the relevance of that? Well, the chaplain actually did not do an analysis of sincerity. In fact, in the transcript, the chaplain specifically stated that even if he found that appellant was sincere in his religious beliefs, he would still deny the meal because he was applying the prison standard that grants meals only to people who fall in three narrow categories. If they have a social connection, a hereditary connection, or a substantial philosophical belief with respect to the religion, clearly a number of people could be sincere in their religious beliefs but not fall within any of these three categories. And so it was an overly narrow regulation. And the chaplain specifically acknowledged on the record that even if he found a finding of sincerity, the meal would have been denied. And that was improper. Counsel, tell me, please, your view on the book that was found. I know it mentioned the Koran, the Old Testament, and the New Testament. But was the book like a book with a point of view urging that one religion was better than the others or should be adopted? Or was it just a neutral kind of comparative religion text? There's no evidence in this regard regarding the particular bent of this book. The book was entitled The Koran and, I believe, Science. And it contains the full Torah therein. And Appellant has asserted in the record that he had kept the book because he was being denied access to religious materials. And the Torah was contained there and he was studying it. So there's no evidence that he was still practicing the Muslim faith while he possessed the book. Okay. Why don't we hear from the other side and then we'll hear from you again. I wanted to suggest to counsel before you sit down that I don't have authority to suggest this, but it seemed to me that Judge Fletcher's question about whether it was really necessary to have a jury was possibly suggesting that Judge Fletcher would be available to mediate this case in lieu of a jury. Did I misspeak? No, you understood perfectly. My services are freely available. Just in case you couldn't quite catch the facetious tone for the transcript, if there ever was a transcript, my comment was facetious. And I think Judge Fletcher is suggesting that my interpretation should be stricken. Wait here with me, counsel. Good morning, Your Honors. My name is Matt France.  I'm here today representing the Appeals Court. I'd like to refer to them as NDOC for convenience, Nevada Department of Corrections. There's two points that I would like to present to you today, Your Honors. The first point being there is no genuine dispute regarding Park's sincerity. The second point being that as an alternative basis for sustaining the lower court's grant of summary judgment, you can rely on qualified immunity. With regard to the first point. You'd want this court to determine qualified immunity without reference to any inquiry at the district court level? To make sure I understand your question. I thought you said that this case could be decided in the alternative on the basis of qualified immunity. Yes. And I understood from that that you were inviting this court to make a determination of qualified immunity. Is that correct? That's correct, Your Honor. If you find that there happens to be a genuine issue of dispute and that, therefore, summary judgment cannot be sustained on that basis, that as an alternative basis, which was raised by NDOC below but not considered by Magistrate Judge Cook or Judge McKibben, that qualified immunity would also provide an alternative basis for sustaining summary judgment. We should pretermend any finding by district court with respect to that. I'm sorry. I'm having a hard time hearing you. Okay. I say that the implication of your argument is that this court of appeals is fully not merely authorized but encouraged to make a determination with respect to qualified immunity without regard to the fact that the district judge hasn't had an opportunity to address that issue or has had an opportunity but has not pursued it. It was my understanding that it's supported by the record and that this court has the power to sustain, to do an over-review, to uphold summary judgment on any basis supported by the record. Now, am I wrong? I thought that there was a claim for prospective relief, that is, for an injunction, also at issue in this case. We don't know what type. He did want declaratory and injunctive relief. He didn't specify declaratory. Well, as to declaratory and injunctive relief, qualified immunity is not a defense. That's correct, Your Honor. Well, I guess that avenue has been closed off. To the extent that we've got a request for an injunction that's a live issue in this case, qualified immunity does not give us an avenue for affirming. All right. Can we focus then on the genuine dispute? Sure. There's no genuine dispute that Parks lacks sincerity. Okay. In Scott v. Harris, if no reasonable jury could believe Mr. Parks' account of events, then the court does not have to adopt that version of events just for purposes of ruling on summary judgment motions. Also, in the Cutter v. Wilkinson case, even under the strict, more strict scrutiny ARLUPA standards, prison officials are authorized to assess an inmate's sincerity. That's the linchpin for both of those claims, for First Amendment claims and for ARLUPA claims. If there is no sincerity, there can be no implication. And the prison officials, that's what they say. Would you agree that it was an error on the part of the district court not to explore ARLUPA's application? In 2004, it would be harmless, Eric. This was back in 2004. In 2008, in light of Shakur and in light of Alvarez, we now know that as soon as prison pro se inmates raise the religion flag, then the First Amendment comes in and ARLUPA comes in. But back in 2004, I wouldn't suggest that it would necessarily be implicated. Well, ARLUPA was not a new statute in 2004. It was not. It was passed, as I recall, in 2000. That's correct. So why are you saying that in 2004, four years after the adoption of the statute, a pro se complaint that pleads facts, it seemed to raise an ARLUPA claim. Nonetheless, there's no ARLUPA claim. Your Honor, there are evidences of Mr. Park's writing samples in the brief. It is somewhat difficult to assess what exactly Mr. Park's is writing. As far as fair notice, that would be one reason why. Counsel, if we find there's not adequate evidence of a sincere religious belief favoring kosher meals, does the ARLUPA issue have to be reached in that case? I don't believe that it does, Your Honor, because as opposing counsel stated, the first phrase of ARLUPA standard in Section 3, there has to be a substantial burden placed on religious exercise. If there is no sincere belief, there can not be a religion or religious exercise. So is there any precedent, counsel, do you know if there's any precedent in any case where a conversion to a different religion within a prison context has to be shown by some type of objective as opposed to purely subjective evidence? Your Honor, I don't know if there is a case specifically on point from any other circuit that would address your question. I would say that in balancing the totality, the record below, there is no indicia of outward manifestations by Park's physical other than his own self-sustaining affidavits or complaints claiming he's sincere. There is no other evidence to support, to bolster his sincerity. And in that vence in front of a jury, it would be high, no reasonable jury would believe Mr. Park's when he, the same time that he receives his kosher food, he files a grievance with the prison saying another inmate interfered with my Islamic religion. But those were different time periods, were they not? He, in 2004, once he got the kosher food, he was still complaining about Islamic beliefs. That's just one of the many reasons why it was difficult for prison officials to find evidence that Mr. Park's had. But he wasn't suggesting that he adhered to both fates at the same time. I don't know, Your Honor. Is it not the case that the claim with respect to the second claim that his Ramadan observances were intruded upon related to a time period prior to the January 1 asserted conversion to Judaism? That's true, Your Honor. But he also possessed a book. The only book in his cell at that time when the prison officials did a corroborating cell search was published by the publishers of the Koran, which would indicate some sort of a bent or a view on that book or the study materials that Mr. Park's had. Might indicate it to a jury. Indicate it to a jury. To a jury. But would be compelling as to entitling the state to a summary judgment? Well, Your Honor, that's just one instance. There are other instances. In February 17th of 2004, he asked the chaplain for a new Jerusalem Catholic Bible. This was also while he was receiving kosher food. Chaplain Stogner in his affidavit of May of 2005, almost a year later, said he still had never seen Mr. Park's engage in ritual prayers. He'd never seen Mr. Park's request permission to observe Jewish fast or holy days. These would seem to be indicia of someone who had a sincere belief. The one instance where Jewish rabbis specifically went to Ely State Prison, there's no indication that Mr. Park's asked to be alerted of such events. It was just testimony that he didn't know. That's correct, Your Honor. This would also imply that he didn't associate with any of the other Jewish inmates at Ely State Prison, that he didn't be asked to observe any Jewish holidays, any Jewish events that might occur at Ely State Prison. It's not the obligation of the prison systems, once an inmate selects a preference, to tell him when and where, what steps he needs to take in order to  That's the obligation of the inmates. Judge Fletcher suggested to your colleague that Mr. Park's claim may be a slim one, but doesn't slim still leave open an aperture to be determined by a finder of fact, be it jury or judge, not to be determined at summary judgment? Slim, yes, but in this instance, with this record below, our argument that there is no reasonable jury that would believe Mr. Park's in his claim of sincerity, where he never engages in ritual prayers, he never asks to observe Jewish fasts or holy days, he asks for Jewish Bibles, he asks the United Church of God, the Christian-based organization, if he can be enrolled in the Good News Bible Study course, all while he is supposedly observing a Muslim faith. It's really unclear to the prison officials how Mr. Park's can be Muslim when he's asking for Catholic Bibles, he's asking for Christian materials, he doesn't pray, he doesn't fast. You know, I'm going back on my resolve not to mediate this case. It occurs to me that a lot of lawyer time and judge time could be saved if the prison, for example, had a free meal choice so that you don't even have to be Jewish to ask for the kosher meal. Would you be suggesting a type of a common fare such as in Resnick? No, no, I'm suggesting something quite different. I'm trying to figure out what's an easy way to satisfy this short of litigation. How hard is it, how much of an imposition is it on the prison officials when somebody says, I would like kosher meals either this week or for the next month or just today to say, here's your kosher meal. And I'm not insisting that you show that you are an Orthodox Jew, here's your kosher meal. Now, there's been a lot of expense put into this case on the part of the state of Nevada. I assume you're not flying down here for free. No. It would not cost them very much to say, here's your kosher meal. Your Honor, it's not an easy question. The administration of the food program, the different various religious diets for the thousand inmates at Ely State Prison, it's not an easy. This question earlier arose, what inmates, there has to be some type of notice. We are looking for a notice. But this is not a question of notice. He's not saying, I asked for a kosher meal and they delayed for a week. That would be a very different case. He's saying, I asked for a kosher meal and they said, no way, never. Well, Your Honor, it's really hard to determine the sincerity for Mr. Parks. We do believe that. Well, I understand that this is a different question and I'll abandon my attempt to settle this case. OK. I will offer you if it'll flesh things out. I will offer you a similar recommendation made by a Third Circuit panel in an analogous case approximately 20 years ago. And the suggestion was that the prison authorities would do themselves and others a great service by simply going ahead and offering kosher meals. So maybe your client might want to think about that a little more. OK. Thank you, Your Honor. We are working toward accommodating the religious dietary needs of all of the inmates, Jewish, Muslim, Christian, Buddhist. There's lots of different types and flavors of religions in the prison systems. We're doing our best. Let me pursue, if I might, Judge Pollack's question. And this is, I think, irrelevant to the actual merits of the dispute. Why did you remove? That was raised. I do not know exactly the specifics of this case as it was consolidated. In my understanding, there was two cases. But from what I view, if the Nevada Attorney General's Office, it's their policy to always remove inmate litigation instead of let it remain at the state court level. It's always the policy to pay the $350 filing fee and remove. As once there's a 1983 lawsuit involved, the next step is to remove and to screen. In the Northern District of Nevada, there's a screening process where they go through and try and weed out some of the frivolous litigation. That's a service offered by the federal courts in the Northern District of Nevada. If I were a Nevada state court judge, would I be entitled to feel a little bit puzzled that the state didn't want me to try a 1983 case? Puzzled maybe, but I don't think that you would miss the inmate litigation. I wouldn't do what? You wouldn't miss it. I don't think that you would miss it. Oh, I wouldn't think that there'd be a lack of business to be done, but curious that the Attorney General of the state would not have sufficient confidence in the state courts to leave the litigation there. It's just my guess, Your Honor, but one practical reason might be is that the state courts don't have online e-filing as of yet. There is some turnover. This is a practical issue. The federal courts have everything online. I don't know. I can take your concerns and your observances back to the Attorney General's office, but that's just my observance is that they always ask to remove the case and everything's online. You know, I'm an outlier here, so you may wonder why I raise any such question at all. I certainly don't have standing to, and I don't want to suggest that your policy of removal to a federal court is unique to Nevada. It's commonplace in Philadelphia, too, and I've always found it an intriguing puzzle in terms of figuring out what our federal system's all about. Okay. All right. Just in conclusion, Your Honors, I would like to submit that there is no genuine dispute with the record below that Parks lacked sincerity, and on that basis, we would ask that the decision of the lower court be sustained, given that Judge McKibben has determined the entire record two times. And if there's no further questions, Your Honors, I thank you for your time. Okay. Thank you very much. Ms. Rae, you've saved a little time. I just would like to address a few short points. First, although the RLUIPA, as my opposing counsel has stated, does authorize prisons to assess sincerity, here I just want to make clear that there was no assessment of sincerity. In fact, the chaplain explicitly stated that even if I find you are sincere, I'm going to deny this meal. And then also, even under the Turner standard, there were no findings about the burden on the prison, and there's no evidence in the record as to why the prison gave and then took away these meals. In fact, after the events stated by the government, the prison actually put Mr. Parks back on the meal and then inexplicably took him off the meal, and that's in the record. So the evidence does show that, in fact, it points away from any substantial burden on the prison in providing these meals because it voluntarily put him back on and then removed him. And then with respect to the sincerity determination, there is no evidence that Mr. Parks was insincere. The grievance related to a fact that occurred the previous year, and it was a complaint about another prisoner, not about a religious accommodation. And the only other evidence is this book, which has been explained. And so there is a dispute about- Is the book, is the full book in the record? It is not. Is it tied? We have the table of contents in the record. And then with respect to the request for religious visits, there is evidence in the record that Mr. Parks felt that he was failed to be informed about the rabbi's visit. That's at ER 164. And then at ER 27 and 117, he claims that he was denied religious materials and that his religious mail was not delivered. And so there also is evidence as to why he would maintain the book that contained the Torah. Let me ask one question, if I may. I understand that you're pro bono. Would the terms of-I'm not even sure if this is the right way to say it-your engagement, if we were to reverse and remand, would you or someone or another lawyer be continuing to represent this client? We haven't reached a determination, but it's certainly a possibility. Because one of the problems, of course, was beforehand that he was prosaic. And that problem might continue. Of course. And it's certainly a possibility. Yeah. Well, I should say this. Independent of the merits of the lawsuit, so I'm not hinting as to merits, demerits, our ruling, and so on, I think I speak for the entire panel. Judge Pollack and I were just exchanging, and I'm sure Judge Gould would agree, thanking you for doing pro bono in this case and in this sort of case. I mean, these are-this is in the highest traditions of the bar to do this. So we appreciate that. Thank you, Your Honors. If there are no other questions, I'd submit. Okay. Thank you. Thank both sides for helpful arguments. The case of Parks v. Brooks is now submitted for decision. We've got two more cases on the argument calendar this morning. But at this time, let's take a ten-minute break.
judges: Fletcher, Gould, Pollak